* * * * * * * * * * *
Upon review of the competent evidence of record, with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, or to rehear the parties or their representatives, the Full Commission affirms, with minor modifications, the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as a matter of law the following, which the parties entered into in an executed Pre-Trial Agreement: *Page 2 
 STIPULATIONS
1. That at all relevant times, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. That at all relevant times, an employee-employer relationship existed between Plaintiff and Defendant-Employer.
3. That Defendant-Employer, Home Buyers Consulting Network, was insured by Hartford Underwriters Insurance on June 9, 2005.
4. That it is stipulated by the parties that the Industrial Commission should calculate the appropriate average weekly wage and compensation rate.
5. That Plaintiff's lumbar injury, arising from a June 9, 2005 injury, is an accepted claim.
 * * * * * * * * * * * EXHIBITS
The following documentary evidence was received into evidence:
 1. Stipulated Exhibit #1: Pre-Trial Agreement
 2. Stipulated Exhibit #2: Medical Records
 3. Depositions: Dr. Albright, Dr. Charron, Dr. Fuller, and Dr. Margraf.
 4. Stipulated Medical Records for Treatment Rendered to Plaintiff Post-Hearing (20 pages, added to the Transcript at the end).
 * * * * * * * * * * * ISSUES
Plaintiff contends that the issues to be determined by the Industrial Commission are: *Page 3 
1. Whether Plaintiff is entitled to additional medical treatment, inclusive but not exclusive of, a pain management program, for her lumbar injury?
2. Whether Plaintiff's cervical injury is compensable?
3. If Plaintiff's cervical injury is compensable, to what benefits under the Workers' Compensation Act is she entitled?
4. Whether Plaintiff's intestinal/stomach injury is compensable?
5. If Plaintiff's intestinal/stomach injury is compensable, to what benefits under the Workers' Compensation Act is she entitled?
6. Whether Plaintiff's severe emotional disturbance/depression is related to her June 9, 2005 injury?
7. If Plaintiff's severe emotional disturbance/depression is related to her June 9, 2005 injury, to what benefits under the Workers' Compensation Act is she entitled?
8. Whether Plaintiff's tremors are related to her June 9, 2005 injury?
9. If Plaintiff's tremors are related to her June 9, 2005 injury, to what benefits under the Workers' Compensation Act is she entitled?
10. Whether Defendants failed to pay medical bills in a timely manner, pursuant to an Order issued by Special Deputy Commissioner Meredith Henderson?
11. If Defendants failed to pay medical bills in a timely manner, what sanctions, if any, should be granted?
Defendants contend the issues to be:
1. Is Plaintiff entitled to any additional medical treatment and/or benefits as a result of her accepted June 9, 2005 lumbar injury and if so, to what specific benefits is Plaintiff entitled? *Page 4 
2. Are Defendants entitled to a credit for an overpayment of temporary total disability benefits due to an incorrectly estimated average weekly wage and compensation rate?
3. Are Defendants entitled to a credit and/or offset for unemployment benefits, payment of medical bills, or other benefits or payments made to Plaintiff?
4. Has Plaintiff brought this hearing without reasonable grounds, entitling Defendants to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1?
 * * * * * * * * * * *
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was 40 years old. Plaintiff, after working for Defendant-Employer for approximately seven weeks, sustained an admittedly compensable injury to her lumbar spine on June 9, 2005. Plaintiff crawled underneath a desk to retrieve faxed papers that had fallen due to a broken tray on the fax machine. After retrieving the papers, she crawled backwards from underneath the desk and as she began to try to stand, she injured her back. Plaintiff testified that she felt a tear "in the back of my neck, across my back, down the right side."
2. Defendants accepted the claim pursuant to a Form 63, and Plaintiff received indemnity benefits at the rate of $266.68 per week based on an average weekly wage of $400.00 per week since the date of injury,
3. Prior to June 9, 2005, Plaintiff experienced significant chronic and long-standing low back problems. The medical records also reveal that Plaintiff, in September 2003, sought treatment for low back pain, and underwent an MRI of her lumbosacral spine, which revealed *Page 5 
degenerative changes at L4-5 and L5-S1, as well as facet joint disease at L5-S1, resulting in a mild impingement on the cal sac and exiting nerve roots, bilaterally. Plaintiff also sought treatment with Dr. Stacy Harris in July of 2004, to whom she reported low back symptoms while working as a dental assistant eight years before. An MRI, performed on July 14, 2004, revealed disc herniations at L4-5 and L5-S1.
4. Plaintiff sought treatment with Dr. Harris on August 19, 2004, reporting that she intended to move from North Carolina in the near future, and was requesting medication refills. Dr. Harris again prescribed to Plaintiff Lidoderm patches, Neurontin, and Percocet.
5. Plaintiff next sought treatment at Wake Health Services on November 24, 2004, and reported to Dr. Connelly that she had a history of a herniated disc and severe pain. Plaintiff's medical records revealed that Plaintiff reported low back pain to Dr. Connelly on February 17, 2005 and February 23, 2005.
6. At the hearing, Juanita Smith and Kristen Gillum, two co-employees of Plaintiff, testified. Both co-employees reported that in the seven weeks Plaintiff worked as a credit counselor with Defendant-Employer, she constantly and on a daily basis complained of low back pain. They also testified that Plaintiff, on a regular basis, appeared to move stiffly and slowly, sometimes holding her chair to assist with ambulation. Ms. Gillum and Ms. Smith also testified that Plaintiff frequently complained of migraine headaches. Both co-employees also testified that Plaintiff reported having received treatment for depression. Ms. Smith testified that she had conversations with Plaintiff about her lack of medical coverage and inability to obtain treatment. Ms. Smith testified that she referred Plaintiff to Rock Quarry Family Medicine.
7. Following Plaintiff's June 9, 2005 admitted low back injury, Plaintiff's first medical treatment was at Duke Health Raleigh Hospital Emergency Department on June 10, *Page 6 
2005. Plaintiff complained of low back pain that began the day before. She did not mention neck pain and reported "no recent injury." Plaintiff's neck was "non-tender" with "painless ROM." The records also reveal that Plaintiff reported a history of chronic low back pain with herniated discs at L4-5 and L5-S1. Plaintiff reported that back surgery was previously recommended, but that Plaintiff was unable to find a provider. Plaintiff was diagnosed with low back strain, given medications, discharged, and advised to remain out of work for one week. Plaintiff sought treatment at Wake Health Services on June 22, 2005, reporting that she "felt a tear up her back after bending over to pick up papers" at work. Additional medications were prescribed. Plaintiff was subsequently referred to a specialist.
8. On July 26, 2005, Plaintiff presented for treatment with Dr. Daniel Albright at Raleigh Orthopaedic Clinic. Plaintiff complained of low back pain on the right, as well as hip pain and numbness. Dr. Albright testified that Plaintiff denied having any pre-existing back pain or problems prior to her work injury. She denied receiving any previous medical treatment for the condition. She denied receiving any diagnostic testing for the condition. At his deposition, Dr. Albright reviewed the prior MRI's and testified that the results sounded very similar. Dr. Albright testified that the 2004 MRI findings suggested real pathology indicating pinched nerves and an expectation that Plaintiff would have leg pain. Dr. Albright testified that the MRI reports seemed essentially the same as the complaints Plaintiff was reporting in July of 2005.
9. Dr. Albright, on July 26, 2005, recommended an epidural steroid injection, but Plaintiff declined. He referred Plaintiff for physical therapy and wrote her out of work until August 9, 2005. Dr. Albright then advised Plaintiff to return to work, light duty, two hours per day, on a gradual schedule. Plaintiff went to three physical therapy appointments and reported a worsening of her symptoms. Return-to-work guideline testing performed on August 18, 2005 *Page 7 
revealed that Plaintiff could return to work, light duty, beginning two hours a day on a graduated schedule. Five days later, Plaintiff returned to Dr. Albright. Dr. Albright testified that Plaintiff was hyperverbal at that return appointment. Plaintiff spontaneously reported to Dr. Albright that she had "suicidal suffering." Dr. Albright attempted to offer Plaintiff a referral to Rex Pain Clinic. He also offered medications and a repeat MRI.
10. Plaintiff testified at the hearing that she was not comfortable with Dr. Albright's treatment, in that he never physically touched her "at all." Dr. Albright testified that he did not physically examine Plaintiff at her second appointment on August 23, 2005 because of Plaintiff's angry and threatening manner, but he did perform a physical examination at his first appointment with Plaintiff on July 26, 2005. Dr. Albright referred Plaintiff to Dr. George Charron.
11. Following Dr. Albright's appointment, Plaintiff underwent a lumbar MRI on September 20, 2005, which revealed the same degenerative changes at L4-5 and L5-S1 as had been shown on the previous MRI's. Plaintiff was seen by Dr. George Charron at Capital Orthopaedic and Sports Medicine Center on October 20, 2005. Dr. Charron diagnosed Plaintiff with asymptomatic L4-5 disc herniation and gave her medication. Dr. Charron also wrote Plaintiff out of work. Subsequently, Dr. Charron offered Plaintiff epidural steroid injections, which she refused. Dr. Charron also referred Plaintiff back to physical therapy. At her initial physical therapy evaluation on November 17, 2005, at Carolina Rehabilitation Services, Plaintiff reported right-sided low back pain from her neck to her foot. Plaintiff subsequently returned to Dr. Charron complaining of dark stools. Dr. Charron referred Plaintiff to the emergency room on November 28, 2005, where she was diagnosed with a gastric ulcer. Although Plaintiff denied any gastrointestinal problems prior to medications received from Dr. Albright and Dr. Charron, the medical records revealed that Plaintiff had been treated at Howard County General Hospital *Page 8 
Emergency Department on May 5, 2004 for chest pain and gastrointestinal complaints. She was diagnosed with esophageal spasm.
12. Dr. Charron, on December 22, 2005, once again recommended to Plaintiff an epidural steroid injection but, once again, Plaintiff declined the injection. On January 9, 2006, Dr. Russell Margraf at Raleigh Neurosurgical Clinic saw Plaintiff, and Plaintiff reported to Dr. Margraf that her injury occurred as she was "lifting a table and feeling a pulling/ tearing sensation down her right lower extremity." Dr. Margraf's medical records from that date, as well as his medical testimony, revealed that Plaintiff was tender and had muscle spasms in her lower back, as well as positive straight-leg raising on the right. However, Dr. Margraf noted that during his physical examination, Plaintiff's neck was "supple with full range of motion." Dr. Margraf diagnosed Plaintiff with an L5 radiculopathy on the right side, and recommended surgery. Dr. Margraf performed an L4-5 hemilaminectomy and discectomy on the right side with proximal L5 foraminotomy on January 17, 2006, which surgery was paid by Defendants.
13. Following Dr. Margraf's surgery, Plaintiff returned to Dr. Margraf for a post-operative appointment. Plaintiff reported several post-surgical anxiety attacks to Dr. Margraf. Plaintiff also reported complaints of blurred vision, double vision, numbness on the right side of her face, as well as tremors and clumsiness in her right upper extremity and hand. Plaintiff also complained of clumsiness in her gait, difficulty going up and down stairs, as well as diffuse right lower extremity weakness. Dr. Margraf testified that Plaintiff reported that her leg numbness improved, and that her strength improved. Dr. Margraf testified that Plaintiff was improving overall. Given her other complaints, Dr. Margraf referred Plaintiff for a brain and cervical MRI. The brain MRI was negative. The cervical MRI showed a very small, broad right paracentral C5-6 disc protrusion, which was mildly compressing the spinal cord on the right. Plaintiff *Page 9 
contends that on June 9, 2005, she also injured her neck, and that she is entitled to all related medical treatment and benefits arising therefrom. However, Dr. Margraf testified that he was unable to offer an opinion as to whether Plaintiff's cervical condition was related to her workers' compensation claim. He testified that at Plaintiff's initial appointment on January 9, 2006, Plaintiff did not mention neck, arm, or face pain symptoms, and that he specifically noted in her physical examination records that her "neck was supple with full range of motion." Dr. Margraf also testified that motor testing to her bilateral upper extremities indicated that Plaintiff had full strength in her arms. Further, Dr. Margraf testified that it was not possible to date the C5-6 finding on the cervical MRI, and that he believed Plaintiff's cervical condition was degenerative, and probably existed prior to her lumbar surgery. Dr. Margraf did not know whether it was possible that Plaintiff's degenerative condition could have been exacerbated or worsened during her lumbar surgery, and would only testify that it was "remotely possible."
14. Defendants proved, by the greater weight of the evidence, that Plaintiff's cervical condition is not causally related to her injury on June 9, 2005. Plaintiff, on the Form 18 that she completed herself, dated August 25, 2005, described a low back injury only. She did not mention or describe any injury to her neck. Further, Plaintiff did not report neck pain and/or symptoms to Wake Health Services, Rock Quarry Family Medicine, Duke Health Raleigh Hospital, Dr. Albright at Raleigh Orthopaedic Clinic, Raleigh Orthopaedic Rehabilitation Specialists, or Dr. George Charron at Capital Orthopaedic and Sports Medicine, in the treatment she received between the time of her injury and her February 8, 2006 appointment with Dr. Margraf. Plaintiff's testimony that her neck condition is related to her compensable injury is not accepted as credible. *Page 10 
15. Plaintiff admitted that she had been treated for depression consistently since age 13, when she was in a motor vehicle accident. Plaintiff was specifically asked about previous psychiatric, psychological, or mental health conditions, including, but not limited to, anxiety, panic attacks, and/or depression, for which she received treatment prior to June 9, 2005. Plaintiff did not report any prior treatment, except for vague references to treatment provided immediately following her 1980 motor vehicle accident. The medical records, however, reveal that Plaintiff sought treatment for stress and anxiety at Howard County General Hospital Emergency Department on May 5, 2004. A July 1, 2004 medical record from Dr. Stacy Harris includes a notation by Dr. Harris to a Dr. Bringman, noting that Plaintiff's referral to Dr. Harris for a psychiatric evaluation. A February 23, 2005 medical record from Wake Health Services, and specifically, Dr. Connelly, noted that Plaintiff was being treated for anxiety.
16. The Full Commission finds as fact that Plaintiff's pre-existing anxiety and depression increased as a result of the nerve pain she experienced from her compensable injury. Dr. Daniel Albright testified, and the Full Commission finds as fact, that people who have "nerve-pain problems" often get stressed from dealing with the pain and have a "mental crisis." Dr. Albright related Plaintiff's increased anxiety and depression at the time he saw her after the injury to the nerve pain she was experiencing from the injury.
17. It is unclear from the record whether any provider actually referred Plaintiff for pain management treatment. Dr. Figueroa testified that on May 15, 2006, Plaintiff reported to Dr. Figueroa that she was waiting on Hartford to approve pain management at UNC. There are no medical records which reference any referral to UNC for pain management. Although Plaintiff's husband testified that Dr. Margraf brought up the subject of pain management, Dr. *Page 11 
Margraf's records do not include any reference or referral to pain management at any facility, and Dr. Margraf, in his deposition, did not testify as to any such recommendation.
18. The Full Commission finds that there is no testimony, anywhere in the record, establishing that Plaintiff's complaints of tremors were in any way related to the June 9, 2005 injury.
19. With respect to Plaintiff's average weekly wage, since Plaintiff worked fewer than 52 weeks prior to her injury, it is fair and just to both parties to compute her average weekly wage by dividing her earnings, including her bonus, by the number of weeks she worked. Defendants contend that a Form 22 wage chart, which is not in the record, but is in evidence, lists Plaintiff's earnings as $2,402.37, and that company payroll records, which are also not in the record, show Plaintiff had earnings of $2,778.80, which appear to reflect the inclusion of a $350.00 bonus. The Full Commission finds that Defendants' Form 63 and Plaintiff's Form 18 are consistent, and Plaintiff's average weekly wage was $400.00 per week.
20. Neither party established that this matter was brought, prosecuted, or defended without reasonable grounds; therefore, no attorney fees are warranted under N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based on the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The Parsons presumption does not apply to Plaintiff's cervical condition. However, even if the presumption did apply, Defendants proved that Plaintiff's cervical condition, and any treatment needed for this condition, are not related to the June 9, 2005 injury. *Page 12 
Plaintiff's testimony that the cervical condition is related is not supported by the greater weight of the other credible evidence of record. Plaintiff did not report neck pain to any medical provider until February 8, 2006, no neck problems were found during several examinations of Plaintiff's neck during the months following her injury, and the greater weight of the medical opinion testimony does not support a causal relationship between Plaintiff's injury and her cervical complaints. Walston v. Burlington Industries, 305 N.C. 296,285 S.E.2d 822 (1982);Parsons v. Pantry, Inc., 126 N.C. App 540, 485 S.E.2d 867
(1997).
2. Plaintiff's pre-existing anxiety and depression increased as a result of the nerve pain she experienced from her compensable injury. Dr. Albright related Plaintiff's increased anxiety and depression to the nerve pain she experienced from the injury. Defendants are obligated to pay for any psychiatric or psychological treatment reasonably related to her lumbar injury, including the treatment provided or recommended by Dr. Albright. Wilder v. Barbour Boat Works, 84 N.C. App. 689,352 S.E.2d 690 (1987).
3. It is unclear from the record the degree of Plaintiff's previous gastrointestinal issues prior to June 9, 2005. Given the possibility that her gastrointestinal issues leading to the emergency department visit on November 28, 2005 may have been related to her medication intake, the Full Commission finds that the emergency department visit is related to her June 9, 2005 injury; however, the evidence does not establish that Plaintiff's gastrointestinal problems are related to her injury. N.C. Gen. Stat. § 97-25; Peeler v. Piedmont Elastic, Inc.,132 N.C. App. 713, 514 S.E.2d 108 (1999).
4. Plaintiff's tremors are not related to the June 9, 2005 injury.Walston v. Burlington Industries, 305 N.C. 296, 285 S.E.2d 822 (1982). *Page 13 
5. Defendants are allowed to direct the care of Plaintiff's low back condition, which includes choosing qualified physicians who will objectively diagnose and treat Plaintiff for her lumbar condition. In turn, Plaintiff has an obligation to follow said recommendations. N.C. Gen. Stat. § 97-25.
6. Plaintiff's average weekly wage was $400.00, yielding a compensation rate of $266.68. Defendants are not entitled to a credit for an overpayment of temporary total disability benefits, if any, due to an incorrectly estimated average weekly wage and compensation rate. N.C. Gen. Stat. § 97-42.
7. Defendants are entitled to a credit and/or offset, if any, for unemployment benefit payments made to Plaintiff. N.C. Gen. Stat. § 97-42.1.
8. Neither party shall be entitled to attorney fees pursuant to N.C. Gen. Stat. § 97-88.1, as both parties proceeded upon reasonable grounds.
 * * * * * * * * * * *
Based on the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall provide appropriate care by qualified medical providers for Plaintiff's lumbar condition. Plaintiff is required to follow said recommendations.
2. Plaintiff's claim for benefits arising from her cervical condition is hereby DENIED.
3. Defendants are ordered to pay for Plaintiff's November 28, 2005 Wake Med emergency department visit when Plaintiff was diagnosed with a gastric ulcer. Defendants are *Page 14 
not responsible for treatment for Plaintiff's gastrointestinal problems beyond the initial evaluation.
4. Defendants are responsible for any and all psychological/psychiatric treatment ordered by Plaintiff's authorized treating physicians which is reasonably related to her lumbar condition.
5. Defendants shall continue to pay temporary total disability compensation to Plaintiff at the weekly compensation rate of $266.68 until further order of the Industrial Commission.
6. Neither party shall be awarded attorney fees pursuant to N.C. Gen. Stat. § 97-88.1.
7. Plaintiff's attorney is entitled to an attorney fee of 25 percent of the ongoing compensation due Plaintiff. Defendants shall deduct every fourth check due Plaintiff and pay the same directly to Plaintiff's attorney.
8. Defendants shall pay the costs associated with this hearing.
This the ___ day of July 2008.
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1